Judge, I'm going to present, I think, an argument that's a little bit different than maybe what we've been dealing with this morning. There's no question that the briefing that's been done in this case is extensive. There's no question that the situation regarding what is the standards or how it can be dealt with by this court has been well covered by the state. Conversely, I take the position that we have responded. The difference, I think, and what I felt like I could present here today for you folks, it's a little differently than you would. I've had this case. I was appointed to represent Bradley Schwartz in November of 2004. I commenced the trial in January of 2006. Age has been interjected into it. I turned 70 years old when I was trying the case in March of that year, and I've been with it ever since. Now, I say all of that for the reason that the arguments that we've really made are the fact that there is, in this case, there was 10 motions for mistrial made over a course of a two-and-a-half-month trial. There were seven motions for mistrial made that had very strong merit. And, in fact, when you deal with the Court of Appeals opinion, they, in the Court of Appeals Division II, acknowledge that on five different occasions, the court struck either testimony or exhibits. So from the standpoint of just the mechanics of the trial, and, again, I've been doing this a number of years also, and I feel like that in many trials you just don't see that degree of situations that arise in the course of the actual trial. Now, does that make it automatically an unfair trial? Certainly it doesn't. But it does when you look at the overall writing facts that were going on. For example, this trial was the most publicized trial in Tucson that we've ever had. And the argument there being is, well, we wanted a change of venue. That's not before you folks. It was denied. But that's neither here nor there. Then coupled with the fact, it was a, as I say, a three-month trial. Number three, it was on court TV, and it was on 48 hours. Now, I'm not saying that that influences the court. But I am saying that it certainly had an impact as to how the overall progression of the trial went in relation to the particular issues that were brought up in the various motions for mistrial that encoded during the trial. So I have taken the position throughout that the argument that he received a fair trial is not valid. In fact, excuse me, Judge. I didn't mean to make you drop here. But the other argument that I'm sure the State, with their very, very competent counsel, who and I have talked about this case a number of times since we've both been involved in it, the argument obviously could be made, well, how badly is Bradley Swartz harmed? Because keeping in mind, he was not found guilty of first-degree murder. He was, in fact, found guilty of conspiracy. The first-degree murder count hung 6-6. Some people would say, geez, Mr. Storch, you did a great job. You hung a jury on a murder case. Well, that may be. But, of course, if the case were to be remanded back, it is going to be a situation where he could and would be charged with that count also on a retrial. So I can understand the argument that where is the real prejudice to Dr. Swartz. The prejudice is, sir, is that the trial, from the function of the beginning of it through the end of it, just simply wasn't put on in a fair and proper manner. Was there intentional prosecutorial misconduct? You know, that gets to be a very subjective argument. The prosecutor that was involved, I know and I know her well, Sylvia Lafferty. She and I have tried. She is from Pinal County. That's another issue that just kind of factored into the case. Pima County's office had to disqualify themselves because of the impact of the Lourdes Lopez situation, who had been an employee, and also Paul Stitzky, who was a terminated employee. So they disqualified themselves, and they brought in an attorney from Pinal County. And Ms. Lafferty is a highly competent prosecutor, which is part of the argument we made in the courts on up the line, is that the arguments and the mistakes that were made by the county attorney's office were such that a competent and experienced prosecutor would not make them. Now, I realize the Court of Appeals took issue with some degree of that argument and then went on and indicated that, well, there was other explanations, and according to the rulings by the judge, weren't such that they were totally incorrect. And I can't quarrel with that ruling on that either. But the bottom line is, is that when you get down to the actual trial itself, when you look at the mistakes that happened, some of them have to be classified if they aren't prosecutorial misconduct. They are extremely sloppy prosecutorial work. And I realize the case law is such that, you know, if it isn't an out-and-out false statement, that doesn't necessarily mandate reversal. I also understand that the case law is such that if, in fact, there is a cumulative effect of it, and that's the argument we're making in a nutshell, is that the reversal and or the new trial is mandated. So the emphasis, I guess, I'm trying to put on all this is not so much what actually happened, but just the whole atmosphere of the trial. And I do think that that's something that this court is the first court that has not been exposed to it, because, frankly, you folks don't much worry about what happens in Tucson one way or the other from the standpoint of the publicity and what have you. I'm certainly not saying that Division II, would that influence them, or certainly Judge Burry. But I do submit that that is a real-life factor when you're talking about this particular kind of a case where you've got one doctor charged with allegedly having a contract killing on another doctor. They're both exceedingly well-known ophthalmologists. And as such, you know, it was a huge event. And as such, I feel that the trial was pushed through by Judge Warner for no other reason than it was impossible to stop it. And that's really kind of the way that I guess I came here to argue to you folks today. Well, you know, counsel. Yes, ma'am. In a way, you're arguing to us as if we were a jury. And we're bound by the terrible restraints of AEDPA. I understand that, Judge. So I think that that's where you need to be focusing your argument is on whether we can disregard what the state did. The argument per se, and you're right, I'm arguing in effect to you in part as a jury because that's what I am as a trial lawyer. But at the same time, I do submit that the case law that we've cited, when you deal specifically with the areas and dealing more importantly with the cumulative effect of it, the cumulative effect of what went on in this case permeated the entire trial. And when you look at the individual motions from this trial and the way that they were responded to by both the state and then later by the Court of Appeals, I think when you go to one directly, it only needs to impact. Take the issue of the doctor. And, you know, we talk about that in that sense, too. Dr. Winston testified time of death was at a certain time. We put on a fellow doctor, another pathologist from Phoenix, Dr. Keene. He made it. It was wrong in the notes that Dr. Winston had put on. Dr. Winston then was recalled by me. He had then explained to the state outside the courtroom that he was going to change his testimony. I wasn't told. And the first we knew about it was when he testified. The judge ended up striking that testimony, Judge, but the point of it was the damage had already been done because all of this had been presented to the court or to the jury. And the jury, sure, the judge admonished him. They disregarded it, but that isn't how it came back. So for that reason, I do submit that the legal arguments that we presented do present themselves and are applicable in this particular case. If the Court would... Do you want to save five minutes for rebuttal? Yes, sir, I do. Thank you. Thank you. May it please the Court. I am Joseph Parkhurst, Assistant Attorney General, representing the Respondents in this case, State of Arizona. I would urge this Court to affirm the district court, whose decision on this matter was correct. The district court correctly set forth the proper standard on habeas review for a claim of misconduct, and that is not the culpability of the prosecutor, though I will argue that that was minimal in this case, but rather the standard of review is whether the trial was fundamentally fair. And the record is clear that it was fair in this case. What the appellant, Dr. Schwartz, attempts to do is basically connect the dots between disparate instances of allegedly improper conduct throughout a lengthy trial. These instances were entirely unconnected with each other, widely separated in real time, most of which involved neither improper evidence nor improper conduct, or where it did involve allusion to a precluded matter, it was cured by means far more appropriate than mistrial and in any event did not render the trial unfair. The focus, as I said, is, and as the district court determined, is that whether fundamental fairness was denied. Both the state courts and the district court found that in four of the seven instances raised in the briefing, in this case, no improper testimony was heard. And in three instances where arguably improper evidence was heard, it was immediately cured by striking the evidence. I have something that concerns me. I would like you to go over all of the excluded witnesses and tell us why they were excluded. I'm not sure I understand which excluded witnesses. Well, there were several witnesses which were supposed to be really in rebuttal witnesses. I understand. That would be Paul Skitsky, I believe, in which this arose during trial. There had been a pretrial order that no one was to testify about Dr. Schwartz's federal charge, which was for drug fraud, basically prescription fraud. His former fiancée was put on the stand. Her name was Lourdes Lopez. And she testified that she had been contacted by the EEA. And the prosecutor asked, because she had been a member of the Pima County Attorney's Office, why did you leave the Pima County Attorney's Office? And she said, and this was basically blurted out, because I knew I was going to be indicted. Now, let's see. What she was going to do, I mean, that was a moment in which Mr. Schwartz claimed or moved from this trial. However, in that particular instance, the trial court determined that the mention of Lourdes Lopez's own indictment was not precluded at all and that the prosecutor's question didn't call for the answer that was given. In another instance, Ms. Lopez testified that she believed Schwartz had made numerous threats against the victim in this case. And she had testified that she never took those threats seriously. And I believe it was on cross-examination that Mr. Schwartz asked her, did you ever mention this to any other individual? And she mentioned a couple of individuals, one of whom was another attorney at the Pima County Attorney's Office, Paul Skitsky. And at that point, the state moved successfully to preclude Mr. Skitsky from being brought in to impeach her. What Lourdes Lopez had testified to was that she actually communicated the threats that Dr. Schwartz had made prior to the murder itself. Whereas from pretrial interviews, Mr. Skitsky had said that Ms. Lopez had mentioned these threats only after the murder. And the defense wanted to impeach her on the matter of when she actually mentioned this. Now, what's significant about this is that in no way would Mr. Skitsky's testimony impeach whether she told Mr. Skitsky about the threats only about when these threats occurred. Nor would it have impeached any of the testimony at trial that Dr. Schwartz had issued threats. So this was properly considered by the trial court to be extrinsic evidence on a collateral matter. It didn't go to guilt or innocence. It only went to at what point did Lourdes Lopez mention these threats to another individual. But Lourdes Lopez had said all along that she never took Schwartz's threats seriously, and indeed numerous other witnesses, so numerous I can't even think of them all, also said at trial that they did not take Schwartz's threats against the victim seriously. So in no way did Ms. Lopez's testimony undermine Schwartz's basic defense that he was essentially just a blowhard, he was puffing, these were empty threats. In fact, her testimony supported that. So to bring Mr. Skitsky in only to impeach her on a collateral matter is something that the rules of evidence normally does not allow. And I probably don't need to remind this Court that the rules of evidence are not constitutional and it's really a matter of due process. The conclusion of evidence has to be so serious and so damaging to the defense that it amounts to a denial of due process. Whereas of course this didn't happen in this case because Lourdes Lopez herself and a number of other witnesses testified that no, we never took him seriously, and that was Dr. Schwartz's defense at trial. In the three instances which the State and the District Court found there was improper allusion to matters that should not have been heard by the jury, this improper evidence was cured, as I said, by striking the evidence, by instruction to disregard the evidence. And moreover, and probably more importantly, no prejudice occurred from it because it was offset by the introduction of materially identical evidence without objection. I'm thinking my opponent mentioned the testimony of Dr. Winston where he had originally given, stated one thing about his notations in the autopsy report and then in real time, a month later, was recalled by the defense and he stated something different. The original erroneous testimony was corrected by Winston himself on the stand before deliberations, so the jury never, never went to deliberations with any kind of sense of false testimony. The defense successfully impeached Dr. Winston's reliability in his estimates and calculations, which was the purpose of the recall. And since a hearing was had by the trial court immediately upon this matter, there was no evidence that the prosecutor knew beforehand Winston's testimony, his original testimony, was in error. In fact, Dr. Winston testified that he himself didn't know his original testimony was in error until two days before being recalled. And the trial court, who was in a position, of course, to determine credibility, credited the prosecutor's explanation that she believed that was the very reason the defense had recalled him so that he could recant that piece of testimony. And, of course, there was no prejudice in any event because Winston did not change his opinion as to the time of death. And this all had to do with his testimony about the setting in of liver mortis, which is the settling of the blood in the dead body. And what he had originally said is that this takes generally, give or take a couple of hours, it generally takes 12 hours to settle. Now, the controversy was that if he noted the blanchable liver mortis at 8.30 the next morning after the murder, then the 12-hour window would have theoretically excluded the hit man, the hired killer, from having committed it. But Dr. Winston also testified that there are a number of factors that affect the blanchability of liver mortis, such as the refrigeration of the body and such as the loss of blood. Both of those can make liver mortis set in the body at a much longer period of time. So his opinion did not change that the time of death was sometime between 7.30 the previous evening and 10.30, 7.30 being the last time we know the victim, Dr. Stidham, was alive, and 10.30 we know from testimony that that's when his body was found. So even in that instance, there couldn't possibly have been any prejudice because he didn't change his opinion at the time of death, and there couldn't have been any culpability of the prosecutor because, as Mr. Stortz mentioned and the briefing mentions, she learned of this only minutes before Dr. Winston was about to testify in the defense case. And, of course, she thought, well, that's why he's being recalled. There are any number of other instances here, and I'd be happy to talk about any of them that the Court would like. But overall, this Court's focus is whether fundamental fairness was denied Dr. Schwartz in this case, and it is not whether the prosecutor was culpable or how experienced the prosecutor was. This Court only looks at whether the trial itself was fair, and here any improper allusions were cured by means far short of mistrial and, as I said, more important, were offset by the introduction of materially identical evidence without objection. And if the Court has no questions, I would urge this Court to affirm the district court.  Thank you. Your Honors, the ---- Do you want to raise the podium? Yes, ma'am. That's fine. You can see me a little more fully, I guess. The last issue that I would talk about that is in the somewhat reverse order is the issue about Dr. Winston. That's the one that I think stands out as a situation where the prosecutor did not and was not candid, nor was Dr. Winston. The reason I say that, it wasn't a question of Dr. Winston being recalled. He indicated he had, and this is in the record, of course, that he had discovered the error he had made at the time of death as far as his notes were concerned, which Dr. Keene had been testified and impeached a day or two before he was called back by our team to testify. He also stated outside that the question came about really is this. He talked to Ms. Lafferty outside the courtroom about 20 minutes prior to him testifying. He testified, and on this sudden change in his notes and why that didn't mean what he had originally said it did, my next question is, when did you discover that and who did you tell about it? Judge Warner said, I'm interrupting you. Approach the bench. Don't answer the question. So then we dealt with that. And at that point, then, she determined that, well, if it was only 20 minutes before that, that's fine. They think the testimony could go forward. But here was the next interesting thing about that. Ms. Lafferty then asked him a question of, well, is there other circumstances that can cause blanchability and or liver mortis to be delayed well over 20 to 24 hours? He immediately responded, yes, on two or three occasions I've had that take place. That's obviously when there was another motion to strike, and the judge did then grant that. The problem with all of that whole scenario of events was is that then the State went on and made the comment, when we're dealing with an intentional conduct by the State, it said, the prosecutor said, and he now looks like a boob and one who is perhaps not candid with the court. Those were the exact words of Ms. Lafferty in relation to the testimony of Dr. Winston. So I submit that that is a standard that this court reviews and does review, and under those circumstances would. As to the Lourdes Lopez situation, well, that's a little different, too. It wasn't just my question of Ms. Lopez, when did you tell Mr. Stitsky about the fact that Dr. Swartz wanted somebody dead? What had gone into that whole series of questions was, and keep in mind, Mr. Stitsky had testified under oath at an administrative hearing before he was terminated, and part of the problems of the questions that were being asked him was, number one, did she tell you he wanted him dead? Number two, did she tell you he wanted to use a hitman? Number three, was he going to make it look like a carjacking? Well, unfortunately, those facts came out very clearly as to this type of murder of Dr. Stittum. It was allegedly he was killed coming out of his office and his car was taken. So I submitted that that wasn't a matter of just simply impeaching her. It was a matter of also expanding upon the impeachment to negate directly to our theory of the case that Dr. Swartz had not made any of those statements prior to anything happening to Dr. Stittum, as far as to Ms. Lopez had made no statements in that regard. Everything she had said had been after the fact when it was clearly the facts were then known to all parties involved. So I submit that when you look at the entire picture as such, it is that the ‑‑ She did testify that he ‑‑ that she told somebody, Mr. Stitts, these things. She had testified, Judge, that he had on ‑‑ And that she told this to Mr. Stitts, right? Right. And she testified that she ‑‑ And did anybody ask her when she told it to him? I asked her, isn't it true that Mr. Tsitsky has testified under oath that you did not tell him this prior to the homicide? Objection. And that answer, that's the way it was left. And then the state then filed the motion in limine to preclude anything further going into that at that point. And that was the issue that we had litigated extensively during the middle of the trial. That was what, I guess, probably a good month plus into the trial. The other issues that related indirectly to also your ‑‑ the argument of possible dealing with your constitutional violations that rise to this level deals with the one on the situation with Lourdes Lopez also. For example, the Court had specifically precluded that there would be no mention about the fact that Dr. Swartz had been indicted and went on diversion in federal court for misuse of prescriptions. Well, didn't she just say she met him first down at the federal courthouse? That was Ms. Nangle, Your Honor. That was a different woman. And that was doing ‑‑ A lot of girls. Yeah, yeah. He was ‑‑ we had a total, I think, of I believe it was six or seven women involved testifying in one aspect or another. But the Lourdes Lopez situation was they asked her, and then she testified, well, the reason I quit the attorney ‑‑ or the county attorney's office, I knew I was about to be indicted. Well, the problem with that, the judge had precluded all of that testimony. We then ‑‑ the jury was excused. We then asked ‑‑ she was then asked by the court, well, did the county attorney tell you that you were not to go into anything of that nature? No. They've never told me that at all. I was not told that my testimony should be eliminated in any way. The answer to that was, well, she was represented by an attorney, so we couldn't talk to her. Judge, that just doesn't hold a whole lot of water because, frankly, her attorney could have been explained to what was going to come down and how that could have been handled. So there was two or three different occasions. And the other one you mentioned was of Ms. Nagle, who then the question was her, well, where did you meet Dr. Swartz? I met him doing urine drops over at the federal building. And, of course, there again, that had also been precluded but came in. I submit, sir, that when you look at the entire package of this case, that the case does meet the standard that would solve for the cumulative neuroanalysis and should be remanded. Thank you very much. Thank you, sir. Thank you all. Interesting argument. And the case just argued will be submitted. Thank you. And the Court will stand in recess for the day. Thank you. Good. All rise. This court for this session is adjourned. This court is adjourned. Thank you.
judges: Fletcher, Reinhardt, Tashima